UNITED STATES of America, Appellee,

v.

**Andres HARO–ESPINOSA, Appellant.**

UNITED STATES of America, Appellee,

v.

**Ernesto VELASQUEZ–RAMIREZ, Appellant.**

UNITED STATES of America, Appellee,

v.

**Porfirio DIAZ–SAMANIEGO, Appellant.**

UNITED STATES of America, Appellee,

v.

**Luis Carlos RUIZ–CHAVEZ, Appellant.**

Nos. 78–3341, 78–3361, 78–3349 and 78–3388.

United States Court of Appeals, Ninth Circuit.

Nov. 21, 1979.

Rehearing Denied March 12, 1980.

---

Domingo R. Quintero, Sheldon D. Sherman, Stuart L. Smits, San Diego, Cal., argued for appellants; Juanita J. Brooks, Philip A. DeMassa, Michael Pancer, San Diego, Cal., on brief.

William A. Bower, Asst. U. S. Atty. (on the brief), Michael H. Walsh, U. S. Atty., William A. Bower, Asst. U. S. Atty. (argued) San Diego, Cal., for appellee.

Before HUFSTEDLER and GOODWIN, Circuit Judges, and KELLEHER *, District Judge.

GOODWIN, Circuit Judge:

Appellants Haro-Espinosa (Haro), Diaz-Samaniego (Diaz), Velasquez-Ramirez (Velasquez), and Ruiz-Chavez (Ruiz) were convicted of conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846. Haro and Ruiz were also convicted of possession of 4.4 pounds of cocaine with intent to distribute, in violation of 21 U.S.C.

---

* The Honorable Robert J. Kelleher, United States District Judge for the Central District of California, sitting by designation.

§ 841(a)(1). A fifth defendant, Luis Gonzales, stood trial with the four appellants but is not a party to this appeal. A sixth defendant, Abel Rodriguez, pleaded guilty to the indictment and did not stand trial. Appellants assert numerous errors. We affirm the convictions.

On June 1, 1978, DEA Special Undercover Agent Licon was introduced to Stanley Flores, who told Licon that he could arrange a delivery of cocaine. Through Flores, Licon met codefendant Gonzales, and eventually purchased an ounce of cocaine from him as a sample.

On June 8, Licon again met with Gonzales, who told Licon that his sources had recently brought three kilograms of cocaine in from Mexicali and could deliver another four when those were sold. Licon arranged to meet Gonzales and one of his "sources" the following day. The next day, Gonzales introduced Licon to Haro, and Licon agreed to purchase 2.5 kilograms of cocaine from Haro.

After the meeting, Gonzales and Haro drove to a local motel and entered a room that had been rented to Abel Rodriguez. Rodriguez left the room a short while later, carrying a shopping bag, and drove to a residence (where Licon had first been introduced to Gonzales).

On June 15, Licon and Gonzales arranged to meet the following day to complete the sale of 3 kilograms of cocaine. On June 16, DEA agents watched Rodriguez leave Gonzales' residence in his Volkswagen, drive back to the motel where he had previously met with Gonzales and Haro, and enter a room that had been rented by appellant Diaz. Almost immediately thereafter, Rodriguez, carrying a brown box, left the room with four other persons. After some discussion, Diaz and Velasquez drove away in Rodriguez's Volkswagen, while Rodriguez placed the box in the trunk of Diaz's Chevrolet and drove with Ruiz to his own residence.

A short while later, Licon met with Gonzales and Haro as arranged the day before. Haro remained at the meeting place with two other DEA agents, Licon's "associates", to take delivery of the purchase money after Licon had seen and tested the cocaine. Gonzales and Licon drove to Rodriguez's house, where he and Ruiz were waiting.

Inside the house, Licon saw four packages containing cocaine sitting next to an empty cardboard box that resembled the one Rodriguez had placed in the trunk of the Chevrolet. A later search of the Chevrolet revealed that the box in the trunk had been removed. While Licon prepared to test the cocaine, Gonzales told Ruiz about the terms of the transaction, whereupon Ruiz insisted that no cocaine could leave the house until the money arrived. Licon agreed to this change from the terms he had agreed upon with Haro and Gonzales.

When Licon remarked that there appeared to be only two kilograms of cocaine present, Rodriguez said that there was more locked in the bedroom but that his wife had the key. At Licon's request, Rodriguez went to his wife's place of employment to get the key, and Licon tested the cocaine. After determining that it was a controlled substance, Licon gave the signal for the arrests to begin.

Haro was arrested at the airport, Ruiz and Gonzales in the house with the cocaine, and Rodriguez in a nearby market. Velasquez and Diaz were arrested at the restaurant to which they had repaired after leaving the motel room earlier in the day. At the time of his arrest, Velasquez had in his pockets the key to Rodriguez's Volkswagen, the key to the motel room rented by Diaz, and an identification card listing his residence as Mexicali, Mexico.

### Severance

Appellants Diaz, Velasquez, and Ruiz contend that they were prejudiced by the district court's refusal to sever their trials from that of codefendant Gonzales. Velasquez and Ruiz had moved for severance. Velasquez argued that Rodriguez would provide exculpatory testimony at a separate trial. Ruiz argued that Gonzales would exculpate him. The court made no decision on the motions at the hearing, stating that

neither moving defendant had made an adequate showing that exculpatory evidence would actually be forthcoming if the trials were severed. The court reserved the question. On the morning of trial, appellants Diaz, Velasquez, and Ruiz moved to sever, again asserting the possibility of exculpatory evidence from codefendants. In aid of the motions, Gonzales stated that he would testify if called by appellants, but only if he was tried first, or if the government would agree that his testimony would not be used against him at his own subsequent trial. The court stated that it was willing to sever Gonzales, but ruled that his trial would have to follow that of the other defendants. Gonzales was on bond, while the multiple defendants awaiting trial were in custody, and their trials were subject to the sanctions of the Speedy Trial Act, 18 U.S.C. §§ 3152–3174.

When counsel for Gonzales objected that the proposed order of trial would deny him any benefit from the severance, the district judge questioned Gonzales in chambers and determined that Gonzales would stand on his Fifth Amendment rights if his trial followed his testimony. An offer of proof was then made on behalf of appellants through their counsel. Counsel for Diaz represented that Gonzales would testify that he did not know Diaz and that Diaz was not involved in any business with him. Counsel for Velasquez represented that Gonzales would testify to the same effect for his client. Counsel for Ruiz represented that Gonzales would testify that Ruiz did not make the statements attributed to him by Licon (that the cocaine would not leave the house until the money arrived; or another statement regarding the quantity of cocaine). The district court refused to examine Gonzales further *in camera* and denied the severance.

A motion for severance is addressed to the trial court's discretion, and a defendant bears a heavy burden in attempting to show that the trial court abused that

broad discretion. *See United States v. Vigil,* 561 F.2d 1316, 1317 (9th Cir. 1977). When the reason for the severance motion is the alleged need for a codefendant's testimony, the moving defendant must show: (1) he would call the codefendant to testify at a severed trial; (2) the codefendant would in fact testify; and (3) the testimony would be favorable to the moving defendant. *See United States v. Vigil, supra; United States v. Wood,* 550 F.2d 435, 438–39 (9th Cir. 1976).

Under *United States v. Gay,* 567 F.2d 916, 918–20 (9th Cir.), *cert. denied,* 435 U.S. 999, 98 S.Ct. 1655, 56 L.Ed.2d 90 (1978), a trial judge may refuse to sever the trials of multiple defendants on the basis of exculpatory testimony which would be given by a codefendant, when that codefendant conditions his offer to testify upon the order of the trials. In this case, the trial judge had good reason for refusing to try Gonzales first. The other defendants were in custody, and Gonzales was on bond. Trying Gonzales first would have created problems under the Speedy Trial Act. It is clear that in relying on *United States v. Gay, supra,* and in denying the severance the trial court did not abuse its discretion.

### New Trial

Appellant Velasquez further contends that the district court erred in denying his motion for a new trial under Rule 29(c), on the ground that the government had failed to disclose exculpatory evidence obtained in an interview with Rodriguez. Rodriguez allegedly stated that Velasquez and Diaz were not involved in the cocaine transaction; Velasquez contends that this testimony was *Brady* material that should have been disclosed to his counsel. *See Brady v. Maryland,* 373 U.S. 83, 86–88, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[1]

Although the suppression of evidence favorable to an accused may violate due process, an important element in the

---

1. Appellant Diaz joins in this argument on appeal, although he evidently made no motion for a new trial in the district court. Because of our disposition of this contention, we need not decide whether Velasquez's motion adequately preserved the issue for Diaz. *Cf. United States v. Wood,* 550 F.2d 435, 442 n.2 (9th Cir. 1976).

*Brady* rule is that the defendant make a request for the exculpatory material. *See Moore v. Illinois,* 408 U.S. 786, 794, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); *United States v. Palmer,* 536 F.2d 1278, 1280 (9th Cir. 1976). In the instant case, no request for the information was ever made, although the record indicates that both Velasquez and Diaz were aware of the possibility that Rodriguez could provide exculpatory testimony. In these circumstances, the failure to make a request or at least an independent inquiry cannot be ignored. *See United States v. Stewart,* 513 F.2d 957, 960 (2d Cir. 1975); *United States v. Tramunti,* 500 F.2d 1334, 1349–50 (2d Cir. 1974). The motion for a new trial was properly denied.

### Sufficiency of Evidence

Appellants Velasquez and Diaz also contend that the evidence was insufficient to support the jury verdicts of guilty on the conspiracy counts. Viewing the evidence and drawing the reasonable inferences favorable to the government as the prevailing party below (*see United States v. Kaplan,* 554 F.2d 958, 963 (9th Cir. 1977)), we must hold that the evidence was sufficient.

The relevant test, as restated by this court, is:

> "Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the *connection is slight,* is sufficient to convict him with [sic] knowing participation in the conspiracy." *United States v. Dunn,* 564 F.2d 348, 357 (9th Cir. 1977) (emphasis in original).

*See United States v. Freie,* 545 F.2d 1217, 1221–22 (9th Cir. 1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1645, 52 L.Ed.2d 356 (1977).

In this case, the evidence established beyond a reasonable doubt that appellants had at least a slight connection with the conspiracy, whose existence is not seriously questioned. The evidence against Diaz showed that: (1) he rented the motel room used by the conspirators as a meeting place; (2) the rental of that room was ex-tended for one day from June 15th to the 16th, after Licon refused to complete the transaction on the afternoon of the 15th; (3) Diaz was present when the other conspirators left the motel room to drive to Rodriguez's house and complete the deal; (4) Diaz allowed Ruiz and Rodriguez to use his car; and (5) his car had been seen approaching the Mexican border on at least eight occasions during the three weeks preceding the arrests. The evidence against Velasquez, although less extensive, similarly provided a clear connection with the conspiracy: (1) he was present when the other conspirators left the motel room on June 16th; (2) when he was arrested, he had possession of the key to the motel room and the key to Rodriguez's Volkswagen; and (3) when Ruiz and Rodriguez approached the automobiles in the motel parking lot, Velasquez gestured towards Diaz's Chevrolet, which Ruiz and Rodriguez then entered and used to travel to Rodriguez's house.

The jury could reasonably have believed that Diaz rented the room and allowed the others to use his car because he was involved in the conspiracy. Likewise, Velasquez's possession of the keys and his gestures in the motel parking lot could reasonably have been viewed by the jury as evidence that he had a directing role in the conspiracy. Mindful that the very nature of a conspiracy generally precludes direct proof of individual participation in the joint endeavor, we conclude that the evidence here was sufficient.

### Expert Witness

Appellants Ruiz and Haro, again joined by Diaz, next contend that the Government's expert witness with respect to identification of the seized substance as cocaine was not qualified as an expert to give his opinion and that his testimony was insufficient as a matter of law to prove that the substance was in fact cocaine as required for conviction under 21 U.S.C. § 841(a)(1). Ruiz also contends that the district court erred in examining the witness as to his expert testimony, which effectively rehabilitated the witness after the defense had damaged his credibility.

■■ None of these related contentions requires discussion. The question whether a witness may be qualified as an expert is a question of preliminary fact to be decided by the district court. Fed.R.Evid. 104(a); *see* Fed.R.Evid. 702. The witness here testified with respect to his professional education, his on-the-job training by the DEA, and his experience in analyzing drug samples. In the circumstances of this case, there. was no abuse of discretion in the admission of this expert testimony. *Cf. United States v. Orzechowski*, 547 F.2d 978, 980–82 (7th Cir. 1976), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977).

■ Further, we do not believe that the testimony of the expert was insufficient to establish that the substance was in fact cocaine, a controlled substance. Haro contends that the tests performed by the expert were insufficient to distinguish between legal and illegal isomers of the drug. Here, the expert ran six separate tests on the substance before concluding that it was the prohibited form of the drug. This evidence was sufficient. *See United States v. Orzechowski*, 547 F.2d at 980–82; *United States v. Hall*, 552 F.2d 273, 274–75 (9th Cir. 1977).

■ Finally, the court did not abuse its discretion in questioning the expert witness on its own accord. It is entirely proper for the court to question witnesses in order to clarify questions and develop facts, so long as questions are nonprejudicial in form and tone, and the court does not become personally overinvolved. *United States v. Landof*, 591 F.2d 36, 39 (9th Cir. 1978). Here, the court questioned the witness only after redirect and recross-examinations had been conducted by counsel. The court's questions sought only to clarify the witness's confusing use of the terms "possibility" and "probability". In these circumstances, there was no abuse of discretion.

### Instructions

■ Haro also contends that the district court should have instructed the jury that it must find that he had conspired to sell an illegal isomer of cocaine in order to convict him on the conspiracy charge. This argument is related to his earlier challenges to the sufficiency of the expert's testimony.

The court refused the instruction proposed by Haro, but it did instruct the jury that it was not bound by the expert's testimony but must determine the weight to be given that testimony, that it must find that Haro had the intent to distribute a controlled substance in order to convict him of the conspiracy count, and that cocaine L (the isomer form testified to by the expert) was such a controlled substance. The instructions, considered as a whole, adequately instructed the jury as to all the matters included within Haro's proposed instruction, and no error was committed.

### Sentence

■ The final assignment of error is Ruiz's contention that his sentence was excessive because it punished him for exercising his right to stand trial. Ruiz was sentenced to ten years, whereas codefendant Rodriguez was sentenced to five years after he pleaded guilty and did not stand trial.

We find no abuse of discretion here. The district court explained its reasons for the disparity in sentences given the codefendants. *See United States v. Capriola*, 537 F.2d 319, 320–21 (9th Cir. 1976). The court stated its belief that Ruiz, together with Gonzales and Haro, was a key figure in a large scale smuggling operation. The court therefore imposed the same ten-year sentence on all three. Appellants Diaz and Velasquez were given the benefit of the doubt, as their roles may have been more in the field of delivery than in the planning in the operation. They received sentences of four years in custody. There was no error.

Affirmed.